**GULF OIL CORP.**

v.

**The MOBILE DRILLING BARGE OR VESSEL known as MARGARET, her Engines, Tackles, Apparel, Drilling Rig and Equipment, etc., Ocean Drilling and Exploration Co. and Shell Oil Co.**

Civ. A. No. 71–3278.

United States District Court, E. D. Louisiana.

Nov. 18, 1975.

Robert B. Acomb, Jr., Glenn G. Goodier, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Shell Oil Co. and Travelers Indemnity Co.

A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for Highlands Ins. Co.

Francis Emmett, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for The Home Indemnity Co.

EDWARD J. BOYLE, Sr., District Judge:

On December 1, 1970, a fire started on Shell's drilling platform off the Louisiana coast in the Gulf of Mexico. Shell contracted with Ocean Drilling and Exploration Company (ODECO) on December 4, 1970 for the drilling of a relief well near the burning platform.[1] Pursuant to the contract, ODECO provided the Drilling Barge Margaret to drill the relief well. On De-cember 30, 1970, at approximately 8:00 A. M., an oil slick on the water near the Margaret was noted by Leo J. Guthrie, Shell's division construction foreman, and by Norris Dodge, Shell's division construction superintendent. Through the use of divers it was determined that the Margaret had been positioned on Gulf's underwater pipeline and had damaged the pipeline, allowing oil to escape.

Gulf then sued ODECO and Shell for damages to the pipeline. Shell filed a third party complaint against Highlands Insurance Company (Highlands) and The Home Indemnity Company (Home), alleging Shell had been named an additional insured in policies issued by Highlands and Home to ODECO.[2] Shell asked that Highlands and Home be held liable for any judgment rendered against Shell, and for penalties, costs and attorney's fees for their failure to defend Shell.

The parties then entered into a joint stipulation on May 20, 1974, which provided in pertinent part:

2. The parties agree that the claim of Gulf Oil Corporation in this matter is valid and recoverable from Shell Oil Company to the extent as herein set out below and that Ocean Drilling and Exploration Company is without fault: Gulf Oil Corporation's claim for damages in this matter is in the amount of $5,869,932.47; of the aforementioned sum, a reasonable settlement is $1,185,485.76.

(a) Of that figure of $1,185,485.76 the sum of $607,361.76 represents costs of repair to the pipeline.

3. Shell Oil Company agrees to pay Gulf Oil Corporation within thirty (30) days hereof or upon demand thereafter the sum of $1,185,485.76, and within ten (10) days after payment, Gulf Oil Corporation agrees to pay Shell Oil Company $185,485.76, which latter sum represents monies advanced by Shell Oil Company for temporary repairs to Gulf Oil Corporation's pipeline.

---

1. Exhibit Gulf 20.

2. Document 72.

4. Shell Oil Company reserves all rights to assert claims as an assured under any Ocean Drilling and Exploration Company's policies of insurance including but not limited to Highlands Insurance Company, Policy No. GA 31 47 86 and The Home Indemnity Company, Policy No. HEC 9792522, but only as an assured, additional assured or co-insured, not by reason of any alleged breach of contractual obligations vis-a-vis Shell Oil Company and Ocean Drilling and Exploration Company, and any such insurers have the right to assert their defenses contrary to Shell's claim.[3]

Gulf demanded payment of $1,185,485.76 in accordance with the stipulation by letter dated June 27, 1974. Travelers Indemnity Co. (Travelers), which had issued a policy covering Shell, advanced the required amount to Shell. Shell paid Gulf $1,185,-485.76, and Gulf then returned to Shell $185,485.76, which Shell had previously advanced for temporary repairs to the damaged pipeline.

Home and Highlands filed third party complaints against Travelers, alleging that Shell's loss was covered by the Travelers' policy issued to Shell.[4] Travelers then filed a counterclaim against Home and Highlands.[5]

The questions for determination by the Court are what insurer or insurers shall pay Shell's loss, whether part of Gulf's loss was damage to oil or gas in place, and whether either Highlands or Home, or both, are liable for penalties and the cost of Shell's defense, including attorney's fees.

### BREACH OF SETTLEMENT AGREEMENT

Shell and Travelers claim in the pre-trial order that an issue exists as to whether Highlands and Home breached the settlement agreement reflected in the pre-trial stipulation. Although it is not entirely clear what actions by Highlands and Home are claimed to be a breach of the settlement agreement, no such breach has occurred.

If Shell and Travelers claim that Highlands and Home breached the agreement by failing to pay the $1,185,485.76, which Gulf agreed to accept in settlement, their contention is clearly without merit. The stipulation provided that Shell would pay Gulf and thereafter assert its claims against Highlands and Home, whose defenses thereto were reserved to them. Shell did pay Gulf and asserted its claims against Highlands and Home, both of which asserted defenses thereto.

■ If Shell and Travelers contend that Home breached the settlement by proposing language whereby Gulf would be paid within thirty days after demand, the actions complained of took place before the stipulation was signed and, therefore, could not constitute a breach of the stipulation.

The assertion of the real party at interest defense by Highlands and Home is discussed hereafter.

### REAL PARTY AT INTEREST

Home and Highlands contend that Shell is not a real party at interest under Rule 17(a), F.R.C.P., since the loss in question has been paid by its insurer, Travelers.

■ Shell, in turn, claims Home and Highlands have breached the settlement agreement reflected in the pre-trial stipulation by raising the issue of whether Shell was a real party at interest. (See Shell Trial Brief, pp. 4, 41–46). This contention is without merit. The stipulation expressly provided that Home and Highlands reserved all defenses to Shell's claims. (See Document # 93).

■ We, therefore, turn to the defense raised by Home and Highlands that Shell is

---

3. Document # 93. Counsel for all parties to this litigation, except Travelers, signed the stipulation. In its pre-trial and post-trial briefs, Travelers urges the binding effect of the stipulation. We find the stipulation is binding on all parties in the case.

4. Documents 91 and 96.

5. Document 97.

not a real party at interest. The purpose of the requirement of Rule 17(a) that suit be brought in the name of the real party at interest ". . . is to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment and that he will be protected against another suit brought by the real party at interest on the same matter." *Celanese Corp. of America v. John Clark Industries*, 214 F.2d 551, 556 (5 Cir. 1954).

There is no danger that Highlands and Home will later be subjected to another suit on the facts at issue here. Both Shell and Travelers are before the Court and will be bound by our decision here.

Since both Travelers and Shell are parties, Highlands and Home could produce any evidence or assert any defenses available as against either Travelers or Shell.

In addition, Shell has demonstrated that it has a substantial interest in the outcome of this litigation. Shell is required to reimburse Travelers for the first $25,000 paid out on Shell's claims under the Travelers policy. In addition, Shell eventually reimburses Travelers for the next $250,000 paid on its claims. Therefore, Shell has paid or will pay $275,000 of its own loss in this case. Shell is clearly a real party at interest.

## INDEMNITY AGREEMENT

By a letter dated in January, 1971, Shell agreed to indemnify ODECO for losses thereafter arising out of the positioning of the Drill Barge Margaret on the Gulf pipeline.[6]

Highlands claims the indemnity agreement also indemnifies the insurers of ODECO. There is no such explicit statement in the indemnity agreement. Furthermore, Highlands is being sued, not as the insurer of ODECO, but as the insurer of Shell.

6. Exhibit Shell 26C is an unsigned copy of the indemnity agreement apparently from the files of ODECO. It is dated January 12, 1971, which was clearly after the date of the damage to the Gulf pipeline.

7. Exhibit Gulf 20.

Therefore, Highlands' contention is without merit.

## DATE OF THE ACCIDENT

From the testimony of Leo Guthrie and Norris Dodge, we conclude the Drilling Barge Margaret damaged the Gulf pipeline on December 30, 1970. Both men testified they first saw an oil slick that day near the Margaret. In December, 1970, Guthrie made a daily helicopter tour of the area near the fire and it is likely he would have noticed an oil slick if one had been present earlier than December 30, 1970.

## COVERAGE BY TRAVELERS

While there is a question regarding the specific Travelers policy which covered Shell on the date of the accident, there is no doubt that Travelers insured Shell and its policy limits on December 30, 1970 were $5,000,000 as to each occurrence of bodily injury and property damage.

## COVERAGE BY HIGHLANDS

Shell claims it was also insured by Highlands, ODECO's insurer, through the following sequence of events: On December 4, 1970, Shell and ODECO entered into the contract for use of the Margaret to drill Shell's relief well.[7] In a letter dated December 23, 1970, W. M. Marshall of Shell requested of ODECO that Shell be added ". . . as a co-assured, for all operations under the contract, in all of the general liability insurance policies . . . required of you [ODECO] in the drilling contract." He further requested that the drilling contract be amended to reflect that agreement. Alden J. Laborde, president of ODECO, signed the bottom of Marshall's letter, indicating his agreement to the proposed amendment. Laborde's signature is dated December 28, 1970.[8]

8. Record, Exhibit 31. A question was raised during trial as to whether Laborde actually signed the letter on December 28, 1970. Laborde testified he could not recall when he signed the letter. Since no positive testimony was offered to show that Laborde signed the

On December 28, 1970, ODECO was covered by Highlands policy # GA 31 37 86, which by endorsement effective July 1, 1970, provided:

"The unqualified word 'Insured' wherever used, includes the Named Insured and also any person or organization to whom or to which the Named Insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or in behalf of or facilities used by the Named Insured." [9]

Therefore, on December 28, 1970, when the drilling contract was amended to require that Shell be named as a co-insured on the Highlands policy, Shell was automatically covered as an insured on Highlands policy # GA 31 37 86. This is true even though the endorsement which purported to add Shell as an additional insured was made effective January 1, 1971, which was after the date the Gulf pipeline was damaged.

### COVERAGE BY HOME

In December, 1970, Home insured ODECO under excess liability policy 979255.[10] By endorsement effective on the issue date of the policy, July 1, 1970, Shell was covered as an additional insured.[11] Therefore, on the date of the loss for which Shell seeks to recover, Shell was also insured under Home policy 979255.

Both Highlands and Home contend that coverage is afforded to Shell under their respective policies only for claims arising out of the negligence of ODECO, the named insured. They claim that since all parties have stipulated that ODECO was not at fault, Shell cannot recover under their policies.

Highlands bases its argument that ODECO must be at fault for Shell to recover under its policy on two provisions in its policy. As previously noted, Endorsement 3, effective July 1, 1970, provided:

"The unqualified word 'Insured' wherever used, includes the Named Insured and also any person or organization to whom or to which the Named Insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or in behalf of or facilities used by the Named Insured." [12]

Endorsement 23, by which Shell was added as an additional assured effective January 1, 1971, provided:

"It is further agreed that Shell Oil Company is included as an additional insured, but only with respects [sic] to Odeco's operations." [13]

Since Endorsement 23 was made effective January 1, 1971, and the loss for which Shell seeks to recover occurred on December 30, 1970, we will not consider the language of Endorsement 23 in determining coverage under the Highlands policy.

Because of the result we reach hereafter, we need not decide whether the Home policy provides coverage for damages arising out of Shell's sole negligence.

Shell contends that the language in the Highlands policy with respect to the operations of ODECO does not specifically restrict coverage to situations where ODECO is at fault. Shell claims the cited language merely limits coverage to damages incurred while Shell and ODECO were performing their respective obligations under the December 4, 1970 drilling contract, regardless of who was at fault.

---

letter on a different date, we accept the December 28, 1970 date as correct.

9. Exhibit Highlands 1, End. 3.

10. Exhibit Christian 3.

11. "It is agreed that while the Insured is performing services for Shell Oil Company, Shell

Oil Company and where work is performed in a joint operation, such other parties in the joint operation with Shell shall be additional Insureds hereunder." Exhibit Christian 3, End. 3.

12. Exhibit Highlands 1, End. 3.

13. Exhibit Highlands 1, End. 23.

An insurance policy is a contract and expresses the law between the contracting parties. It must be enforced according to its terms where there is no ambiguity. *Carter v. Amar*, 268 So.2d 141 (La.App. 1 Cir. 1972).

The Highlands policy clearly provided coverage to Shell for the damage to Gulf's pipeline. We reach this conclusion for several reasons.

First, Shell is correct in pointing out that the policy contains no express exclusion of coverage for damages arising out of the sole negligence of the additional insured. Had it been the intent of all parties to the contract to exclude coverage for damages arising out of Shell's sole negligence, it would have been simple to express this intent clearly in the policy.

■ Furthermore, the insurer bears the burden of proof when it seeks to avoid liability under an exclusion. *Broussard v. National Am. Life Ins.*, 302 So.2d 627 (La. App. 3 Cir. 1974), *writ denied*, 305 So.2d 133 (La.); *Smith v. Ranger Ins. Co.*, 301 So.2d 673 (La.App. 3 Cir. 1974). Highlands has not carried its burden.

■ A further reason for finding that Shell's claim is covered results from a consideration of the insurance contract in its entirety. (See LSA–R.S. 22:654). The Highlands policy is a comprehensive general liability policy. Clearly, it was the intent of all parties that Shell be added as an additional insured. We find that Shell paid for insurance coverage as part of the daily rental it paid for the Margaret. However, if Highlands' interpretation that Shell was covered only for claims arising out of the

negligence of ODECO were adopted, the coverage that all parties intended Shell should have, and which Shell paid for, would be rendered illusory. Under such interpretation, Shell would be deprived of coverage where neither Shell nor ODECO were negligent and the loss was caused by the negligence of a third party, as well as where Shell was solely negligent. We, therefore, decline to accept Highlands' interpretation of the policy.

■ Alternatively, if the language in the Highlands policy is not clear, then it must be construed strongly against the insurer. *Hartford Fire Insurance Co. v. Roger Wilson, Inc.*, 252 So.2d 161 (La.App. 3 Cir. 1971), *writ denied*, 259 La. 939, 942, 253 So.2d 381, 382; *Rachal v. Union Natl. Life Ins. Co.*, 184 So.2d 775 (La.App. 3 Cir. 1966). When the ambiguous language is construed most strongly against Highlands, the policy must be held to provide coverage to Shell for all claims arising out of operations under the December 4, 1970 drilling contract between ODECO and Shell regardless of whether either or both were at fault. Therefore, the claim against Shell for damage to the Gulf pipeline is not excluded by the "operations of ODECO" language in the Highlands policy.

## TENDER OF DEFENSE

Highlands claims it had no duty to defend because Shell made no tender of defense to it.

■ The Highlands policy outlines the duties of an insured in event of occurrence, claim or suit.[14] The listing, which appears

14. (a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable. The named insured shall promptly take at his expense all reasonable steps to prevent other bodily injury or property damage from arising out of same or similar conditions, but

such expense shall not be recoverable under this policy.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property

to be exclusive, does not require a tender of defense.

Highlands had a duty to defend under the policy.[15] Accordingly, no tender of defense was required provided Highlands was made aware of the existence of the claim.

However, if a tender of defense were required, we find that one was made in Exhibit Shell 36, the August 30, 1971 letter from Wilfred Beauford of Travelers to Gillis Melancon of Highlands. Although that letter did not ask Highlands to defend Shell against the claim of Gulf, it did request Highlands to pay its policy limits in settlement and to reimburse Travelers for 50% of the cost of the investigation. However, Melancon testified he regarded the letter as a tender of defense.[16]

The Highlands policy is a primary policy[17] with $250,000 coverage. There is no statement in the policy that it is in excess or applies only in the absence of other insurance limits for property damage, each occurrence, on the date of the accident.

The Home policy is designated on its face as an excess liability policy. The coverage limit for each occurrence is $2,000,000. The limits of liability are shown as follows:

"The Company shall only be liable for the ultimate net loss the excess of either (1) the amount recoverable under underlying insurances as set out in the attached schedule . . ."[18]

The schedule of underlying insurance reads in part:

"Comprehensive General
Liability (Domestic)          $250/250,000   PD

\* \* \* \* \* \* \*

Protection & Indemnity
including Time Charterers
Legal Liability          $500,000 Each Vessel"[19]

Home claims its coverage of Shell began at $500,000 since Shell was required to maintain $500,000 underlying protection and indemnity including time charterer's legal liability coverage per vessel. Shell claims Home's coverage began at $250,000 since Shell was only required to maintain $250,000 underlying comprehensive general liability coverage. Because of our disposition of the case, it is not necessary to determine whether Home's coverage was excess of $250,000 or excess of $500,000.

### TRAVELERS POLICIES

At various stages of this litigation, different policies have been represented by Travelers and Shell to their opponents as the policy in effect between Travelers and Shell on the date of the accident.

The first policy which was claimed to be the Travelers policy in effect on December 30, 1970 showed coverage limits of $1,000,-

---

damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.
Exhibit Highlands 1, Condition 4.

**15.** The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
    A.  bodily injury or
    B.  property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
Exhibit Highlands 1, Coverage A, Bodily Injury Liability, Coverage B, Property Damage.

**16.** See Trial Transcript, Vol. II, pp. 204–208, especially p. 207, l. 25.

**17.** "The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance."
Exhibit Highlands 1, Condition 6.

**18.** Exhibit Christian 3, page 1, II.

**19.** Exhibit Christian 3, End. 2.

000 per occurrence for property damage.[20] It is clear that the coverage limit on this policy was incorrect, since there is no question that the applicable limit of coverage by Travelers for property damage on December 30, 1970 was $5,000,000.

Later, the parties were furnished with policy # TRNSL–928917–69, effective July 1, 1969 to July 1, 1972, Exhibits Travelers 6 and 10 ('69–'72 "underlying"[21] policy). Finally, policy # TRKSLGO–928935–69, effective July 1, 1969 to July 1, 1972, Exhibit Travelers 1 ('69–'72 manuscript policy) was represented to be the policy in effect on the date of the accident.

Disregarding the policy showing coverage limits of $1,000,000, there are two separate policies which are each alleged to be the genuine policy providing coverage to Shell for the accident. Shell claims the true policy is the manuscript policy. Highlands and Home claim the "underlying" policy was the one in effect. Naturally, each party seeks to have the Court rule that the policy most advantageous to it is the policy to be given effect. Shell and Travelers claim that under the manuscript policy the Travelers coverage is excess to Highlands and Home. If both Highlands and Home are required to pay their policy limits, then Shell's entire claim will be covered and Travelers will pay nothing.

On the other hand, Home and Highlands claim that under the "underlying" policy, Travelers coverage would be primary. If Travelers is required to pay the claim as the primary insurer, Highlands and Home would pay nothing.

In his deposition, Thomas A. Jackson, Travelers Assistant Secretary, Special Accounts Marketing Metropolitan Division, explained why two Travelers policies insuring Shell, effective for the same period and providing similar coverage, were issued. He said that in providing insurance for Shell, whose operations are worldwide, Travelers standard policy forms are not satisfactory and coverage must be negotiated particularly for Shell. Often the negotiations continue several years beyond the expiration of the current policy. Louisiana is a closed rating state and requires that insurance policies be filed with the insurance rating commission. To satisfy this requirement, Travelers issues an "underlying" policy which it files with the rating commission.[22] When negotiations between Shell and Travelers are completed, a manuscript policy is issued which contains all the negotiated changes, is effective retroactively to the expiration date of the previous manuscript policy and which both Shell and Travelers consider to be the contract between them.

However, at times Shell and Travelers represent to others that the "underlying" policy is the contract between them. The "underlying" policy has been furnished in at least one other lawsuit in addition to the present one, as a genuine policy in effect.[23]

---

**20.** Exhibit Travelers 10, TRNS–928917–69.

**21.** Throughout this litigation, the parties used the term "underlying" to describe the Travelers policy which was filed with the Louisiana Insurance Rating Commission. While we recognize the possibility of confusion because "underlying" usually denotes a policy which covers a loss before an excess insurer is called upon to pay, we have used the term "underlying" in the same sense as the parties and witnesses have used it.

**22.** Home and Highlands claim that because the "underlying" policy was filed with the Louisiana Insurance Rating Commission, Travelers is now estopped from claiming that a different policy was in effect.

We reject this contention for several reasons. The purpose of the Louisiana rating law is to guard against excessive, inadequate or discriminatory insurance rates and to authorize and regulate cooperative action among insurers. LSA–R.S. 22:1402. It is not designed to furnish third parties such as Highlands and Home with information about the terms of an insurance contract. Also, neither party has cited any authority for the proposition that if an insurance policy which is required to be filed with the rating commission is not filed, the policy may not be given effect.

Furthermore, Highlands and Home took no action in reliance on the rating commission's records reflecting the "underlying" policy as the one in effect between Shell and Travelers.

**23.** *Elston v. Shell Oil Company*, 376 F.Supp. 968 (E.D.La.1973), aff'd, 495 F.2d 1371 (5 Cir. 1973).

Carmen Pappalardo, Travelers account executive in the special accounts marketing department, testified in his deposition that since the manuscript policy was the product of years of negotiation and contained Travelers rating program, he did not want the manuscript policy to become available to Travelers' competitors, so he requested that a copy of the "underlying" policy be certified as the policy in effect in connection with this lawsuit.[24]

In addition, Shell has represented to its excess insurers that the "underlying" policy rather than the manuscript policy with Travelers is in effect as underlying coverage.

The "underlying" and manuscript policies are very similar. The coverage limits in the manuscript policy and the "underlying" policy, as endorsed, were identical. The only difference in the policies material to the dispute here is the clause which designates whether the policy is primary or excess.

The "underlying" policy provides in the printed section of the policy:

"The insurance afforded by this policy is primary insurance, except where stated to apply in excess of or contingent upon the absence of other insurance."[25]

By endorsement effective July 1, 1969, the policy was amended to read, "The insurance provided by this policy shall be excess over any other valid and collectible insurance."[26]

The manuscript policy provides as follows:

"If the insured has other insurance against a loss covered by this policy, the insurance under this policy shall be excess insurance over other valid and collectible insurance available to the insured, unless such insurance was specifically purchased by the named insured to apply in excess hereof."[27]

Assuming for the sake of argument that the Home policy provides coverage for the damage to the Gulf pipeline, we turn to Shell's contention that the Travelers manuscript policy controls. Shell claims that Home must pay its loss before Travelers since the Home policy was not specifically purchased by Shell to apply in excess of the Travelers policy.

The Home policy provides:

"If other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance."[28]

We find it unnecessary to determine whether the provisions of the Travelers underlying policy or the manuscript policy control, since even when the "other insurance" clause most favorable to Shell and Travelers in the manuscript policy is considered, Home's coverage is clearly excess of Travelers.

The Louisiana Insurance Code provides: "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or

---

24. Pappalardo Deposition, p. 15.

25. Exhibit Travelers 6, Condition # 6. It should be noted that this language is identical to language in the Highlands policy, Exhibit Highlands 1, Condition 6.

26. Exhibit Travelers 6, End. 8000.

27. Exhibit Travelers 1, p. 16, # 5. Identical language is contained in the previous manuscript policy effective July 1, 1966 to July 1, 1969. Exhibit Travelers 2.

The quoted portion of the manuscript policy raises the further question whether Shell purchased the coverage under the Highlands and Home policies covering Shell as an additional insured. While it is not necessary to resolve the question considering our disposition of the case, were a finding required, it is clear that Shell did pay for such coverage. *Day v. Ocean Drilling & Exploration Company*, 353 F.Supp. 1350 (E.D.La.1973).

28. Exhibit Christian 3, Condition 9.

application attached to or made a part of the policy."[29]

An insurance policy is a contract between the parties and is construed in accordance with the usual rules for the interpretation of contracts. *Monroe Air Park No. 1 v. American Aviation & General Ins. Co.*, 41 So.2d 795 (La.App. 2 Cir. 1949). If possible, the policy should be construed so that every part of the policy is given effect. *Labbe v. Mt. Beacon Ins. Co.*, 221 So.2d 354 (La.App. 4 Cir. 1969). A principal consideration in the construction of an insurance policy is the intention of the parties as revealed in the language of the policy. *Graves v. Traders & General Ins. Co.*, 252 La. 709, 214 So.2d 116 (1968).

The Home policy clearly reflects an intent as between Home and ODECO that excess coverage was to be provided. The policy is printed on a form designated "excess liability policy." The limit of liability is phrased in terms of the excess of the amount recoverable under underlying insurance which the insured is required to maintain.[30] The policy provides that liability shall not attach unless the insured or the underlying insurers have paid the underlying limits. Finally, the policy provides Home shall have no duty to defend the insured, but Home may, if it chooses, participate in the defense or settlement of a claim with the insured or the underlying insurers.

In contrast, the Travelers manuscript policy requires no underlying coverage. It covers losses from the first dollar after a deductible is paid. In addition, Travelers is required under the policy to defend Shell.

The circumstances surrounding the issuing of the Home and Travelers policies support our conclusion that Home's coverage is excess to Travelers. Anthony Christian, vice-president of Home, testified that his company first insured ODECO in 1970. Marsh & McLennan insurance brokers submitted an application on behalf of ODECO, whose coverage had previously been placed with another insurer. The application contained language including Shell as an additional insured under the proposed Home policy. The proposed language was incorporated and effective on the date of issue, July 1, 1970, Shell was included as an additional insured on the ODECO policy issued by Home. Home charged no specific additional premium for adding Shell as an additional insured.[31]

There is no evidence to indicate that at the time ODECO's coverage was being negotiated there was any contact between Home and Shell regarding the coverage to be provided Shell in the ODECO policy. If Shell intended that Home's coverage would be primary to Travelers coverage in contradiction of the clear language of Home's policy, the evidence does not show that Shell communicated that intention to Home.

It is difficult to believe that Home, by including an additional insured under its policy covering ODECO for which it charged no specific additional premium, intended to be bound by unknown provisions in other insurance policies covering the additional insured. The clear language of the Home policy reflects that this was not its intention. Accordingly, we find that Home's coverage is excess to Travelers. Travelers limits are $5,000,000, and the total claim is $1,185,485.76. The entire claim will be paid before Travelers policy limits are exhausted and Home will not be required to pay any part of the claim.

## APPORTIONMENT BETWEEN HIGHLANDS AND TRAVELERS

The Highlands policy provides that when the insurance under the policy is primary and the insured has other excess insurance, Highlands' liability is not reduced by the existence of the other insurance. It further provides that when other insurance is available on the same basis as the Highlands

---

**29.** LSA–R.S. 22:654.

**30.** Exhibit Christian 3, p. 1, III, and p. 7, # 15, and End. 2.

**31.** Christian Deposition, Document 118, pp. 13–17.

coverage, contribution shall be by equal shares where the other insurance provides for contribution by equal shares.[32]

The Travelers "underlying" policy contains an identical provision.[33] It also contains an endorsement which states, "The insurance provided by this policy shall be excess over any other valid and collectible insurance."[34] Whichever provision is given effect, the result will be the same. Highlands will pay its policy limits, $250,000 (either as a contribution by equal shares or as a primary insurer) and Travelers will pay the balance.

An identical apportionment results if the Travelers manuscript policy is held to apply. That policy provides that all other insurance, except insurance specifically purchased by Shell to be excess to the Travelers policy, is primary to Travelers coverage. Under the manuscript policy, Highlands would pay its policy limits $250,000 as primary insurer, and Travelers would pay the balance as excess insurer. Therefore, we find Highlands is liable for $250,000, and Travelers for $935,485.76.

Of Shell's claim of $1,185,485.76, $607,-361.76 represents the cost of repair of the pipeline. The remainder, $578,124.00, was paid to Gulf in connection with its claim for loss of revenue or profits resulting from inability to operate its wells due to the casualty.

Home contended the "loss of production" exclusion in its policy bars recovery for the aforesaid item of loss.[35] Shell counters that the claim does not represent one for loss of minerals or loss of production thereof,[36] but rather one for loss of profits. Shell's position is supported by the testimony of Gulf's reservoir engineer, its attorny and its ac-

countant. *See Continental Oil Co. v. SS Electra*, 431 F.2d 391, 392 (5 Cir. 1970).

Highlands made no contention similar to Home's. Its policy provided an additional $100,000 coverage for property damage to "oil, gas, water or other mineral substances which have not been reduced to possession above the surface of the earth."[37] However, Shell's claim is not for damage to minerals in place and it has not contended that it is entitled to recover under the additional coverage endorsement.

We need not decide whether the Home policy exclusion applies to this portion of Shell's claim in view of our conclusion that Home's policy coverage is excess to that of Highlands and Travelers.

### ATTORNEYS' FEES AND DEFENSE EXPENSES

■ Shell and Travelers claim attorneys' fees from Highlands and Home based on the failure to defend Shell. Home owed Shell no defense and, therefore, cannot be liable on the claim for attorneys' fees.

■ Highlands' refusal of the defense it was required by its policy to provide makes it liable for the cost of defense and attorneys' fees. *Audubon Coin & Stamp Co. v. Alford Safe & Lock Co.*, 230 So.2d 278 (La. App. 1 Cir. 1969); *Fontenot v. State Farm Mutual Insurance Company*, 119 So.2d 588 (La.App. 1 Cir. 1960); *Kansas v. Sun Indemnity Co. of New York*, 37 So.2d 621 (Orleans App.1948); *Standard Surety and Casualty Co. v. Perrin*, 19 So.2d 783 (Orleans App.1944).

Involved are attorneys' fees of $20,000.00 incurred by Travelers, attorneys' fees of $15,000.00 claimed for services rendered by Shell's house counsel and $34,683.67 of ex-

---

**32.** Exhibit Highlands 1, Condition 6.

**33.** Exhibit Travelers 6, Condition 6.

**34.** Exhibit Travelers 6, End. 8000. It is alleged this endorsement is ineffective because the issue date does not appear on it and it is possible it was issued after the date of the accident in question here. We need not resolve this issue in the light of the result we reach.

**35.** See Home's post-trial brief, pp. 27–30.

**36.** The evidence shows that only a very small amount of product was lost through the rupture in the line.

**37.** Highlands Exhibit 1, End. G214, effective July 1, 1970.

penses, including some taxable, but undocketed, costs.[38]

Travelers does not object to Shell's recovery of the value of the latter's house counsel's services which, from the statement thereof in the record,[39] appear to have been rendered in connection with the defense of the Gulf claim. Nor has the reasonableness of the amount thereof been questioned. Highlands, however, takes the position that Shell may elect to have its house counsel provide services in a case where an insurer is obliged to provide a defense, but may not look to such insurer for payment for such services.

Shell has not shown that the defense provided by Travelers was inadequate or that to obtain an adequate defense its house counsel's services were necessary to supplement the services of the attorneys provided by Travelers to defend it. Shell may not recover from Highlands for its house counsel's services.[40]

The total ($54,683.67) of fees incurred by Travelers ($20,000.00) and the other defense expenses ($34,683.67) must be borne by Travelers and Highlands in the amounts of $43,151.75 and $11,531.92, respectively.[41] Accordingly, Shell and Travelers are entitled to recover from Highlands [42] $11,531.92 on account of attorneys' fees and other defense expenses.

**38.** See the post-trial stipulation of the parties. Record Document No. 155.

**39.** See Shell Exhibit # 95.

**40.** Shell has not asserted a claim against Travelers for recovery of, nor does the evidence show that Travelers has paid, any part of house counsel's fees.

**41.** Highlands' liability of $250,000.00 is 21.08841% of the total liability of Shell to Gulf ($1,185,485.00). $54,683.67 × 21.08841% = $11,531.92.

**42.** See Stipulation referred to in footnote 38.

**43.** All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employ-

## STATUTORY PENALTY

Shell claims Highlands is responsible for the statutory penalty provided for in LSA–R.S. 22:658 [43] where the insurer's failure to pay a claim under a policy has been "arbitrary, capricious, and without probable cause." Under Louisiana law, the failure of an insurer to pay a claim based solely on the insurer's incorrect interpretation of language in the policy it wrote, is deemed to be arbitrary, capricious and without probable cause. *Reichert v. Continental Insurance Company*, 290 So.2d 730 (La.App. 1 Cir. 1974), *writ denied*, 294 So.2d 545 (La.1974). Even if the language in question has never been litigated before, the risk of erroneous interpretation is that of the insurer, not the insured. *Seguin v. Continental Service Life & Health Insurance Company*, 230 La. 533, 89 So.2d 113 (1956); *Campasi v. Mutual Benefit Health & Accident Association*, 207 La. 758, 22 So.2d 55 (1945).

Further, the insurer must be held to the knowledge that any ambiguity in the policy will be interpreted in favor of the insured. Considering this rule of interpretation, the insurer's failure to pay a claim unless it is clearly and unambiguously excluded by the policy is without probable cause.

ee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees.

**14**

Therefore, Highlands is liable for the statutory penalty of 12% of $250,000, or $30,000 for its failure to pay Shell's claim.

### THE RELIEF ALLOWED

Home is entitled to judgment in its favor dismissing, with costs, the third party complaint of Shell and the counterclaim of Travelers.

Shell and Travelers are entitled to judgment against Highlands in the sum of $250,000.00, its policy limit, plus $11,531.92 for attorneys' fees and other defense expenses, and for docketed taxable costs.

Shell is entitled to further judgment against Highlands for 12% of $250,000.00, or $30,000.00, representing the statutory penalty for failure to make payment of its policy limit.